Jasen, J.
(dissenting). I believe that the majority’s approach
is overly simplistic. Of course, commercial speech is protected by the First Amendment. The finer question, not considered by the majority, is whether commercial speech, historically treated differently from other forms of communication, is *537 protected to the same extent as other speech. In my view, the First Amendment, as the Supreme Court has now twice stated, requires that a court, in passing upon the constitutionality of a legislative enactment affecting commercial speech, engage in balancing the competing societal interests represented. The court in reaching its decision does not take into consideration the relevant factors, which in my view render the ordinance constitutional. Accordingly, I dissent.
The defendant, convicted of distributing commercial handbills on the public sidewalk in front of Madison Square Garden, challenges the constitutionality of an ordinance prohibiting the distribution of purely commercial and business advertising handbills on the streets of the City of New York.
In 1974, defendant Ronald Remeny was arrested for distributing handbills promoting two musical concerts. The leaflet, which was labeled "Concert News”, identified the performers by name and by photograph, set forth the dates and places of the concerts, the price scales of the admission tickets, and listed places and telephone numbers through which interested persons might purchase tickets or obtain further information. After trial, defendant was found guilty of violating subdivision 5 of section 755(2)-7.0 of the Administrative Code of the City of New York[1] and was sentenced to a fine of $10 or a term of two days’ imprisonment.[2] The Appellate Term, with one Justice dissenting, affirmed the judgment of conviction.
This case does not involve the total prohibition of commercial and business advertising as ample alternative channels for communication of the information are available. The ordinance also does not attempt to regulate or censor the content of the commercial message, but, rather, regulates the place and the manner of communication to the public. What is at issue is whether the City of New York, in prohibiting the *538 distribution of all purely commercial and business advertising leaflets on its streets and thoroughfares, unconstitutionally infringes the freedom of speech.
That the First Amendment protection of the freedom of speech may attach to the dissemination of some kinds of commercial information can no longer be disputed. (Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748.) The fact that commercial speech may be constitutionally protected does not end discussion, thereby dooming the antilittering ordinance to unconstitutionality. Whatever constitutional protection commercial speech has, the protection is not absolute and commercial speech itself is not inviolate. As with other forms of speech, commercial speech may be regulated as to time, place, and manner, in furtherance of a substantial governmental interest. Thus, to resolve the issue, it is necessary to consider the extent of the First Amendment protection accorded commercial Advertisers, as well as the countervailing interest of the city in regulating traffic and commerce on its streets, particularly the control of littering. This, regrettably, the majority fails to do.
Historically, information and opinion disseminated in a commercial context, because of its mercantile origins and self-serving nature, has not been afforded First Amendment protection. Understandably, commercial speech was considered less essential to society than political, social and religious expression, all of which contribute to essential public debate and enlightenment, and are not motivated by personal financial profit. However, in more modern times, increasing recognition has been given to the strong relationship between commercial speech and our system of free personal economic choice. Since our economy is predicated primarily upon free enterprise, it is essential that the aggregate of private, economic decisions be intelligent and well informed.
It does not necessarily follow, however, that commercial speech, and the methods by which commercial information is communicated to the consuming public, can never be regulated in any way. As with other forms of expression, significant governmental interests may require some regulation. There is no doubt that government could, in the name of peace and quiet, prohibit sound amplification equipment from blaring prerecorded "jingles” at all hours of the night. Surely a prohibition against the posting of political, religious, social or commercial posters on public bridges, buildings and trqes *539 would be a form of regulation of free speech that would not infringe the First Amendment interest. Likewise, a regulation prohibiting the distribution of any kind of material in mailboxes would certainly be constitutional. Nor can it be said that the Constitution licenses a commercial enterprise to hire a helicopter to drop tons of advertising leaflets onto the streets of Times Square. I mention only a few examples to illustrate that all forms of speech, commercial as well as other varieties, although protected, can be regulated, provided a significant governmental interest is served and ample alternative channels for communication of information are available. Hence, a regulation reasonably restricting the time, place and manner of distribution of otherwise protected speech material does not constitutionally infringe upon the freedom of speech. Since I believe that the New York City antilittering ordinance is a reasonable limitation on the manner in which commercial advertising can be distributed in particular places, the public streets, I would affirm the order of Appellate Term.
The constitutionality of this antilittering ordinance has been tested once before in the 1942 case of Valentine v Chrestensen (316 US 52). Acting under the ordinance, the police restrained the distribution of leaflets advertising the availability of paid tours through a former United States Navy submarine. Chrestensen thereupon appended to the other side of his leaflet a "protest” against the city’s denial of permission to use a public pier for exhibition of his submarine. When the police prevented him from circulating his amended leaflet, he sought injunctive relief in the Federal courts. The Supreme Court ruled that the lower courts erred in granting the requested injunction. The court took note of the many earlier cases in which it was held that the streets are proper places for the communication and dissemination of information and opinion and that while the government could regulate the use of the streets, it could not impose burdensome conditions nor prohibit such use entirely. (See Hague v CIO, 307 US 496; Lovell v Griffin, 303 US 444; Schneider v State, 308 US 147.) It was concluded that "the Constitution imposes no such restraint on government as respects purely commercial advertising. Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment. The question is not whether the legislative body may interfere *540 with the harmless pursuit of a lawful business, but whether it must permit such pursuit by what it deems an undesirable invasion of, or interference with, the full and free use of the highways by the people in fulfillment of the public use to which streets are dedicated.” (316 US, at pp 54-55 [emphasis added].) The court also rejected Chrestensen’s attempt to evade the scope of the ordinance by appending a protest to his handbill. "If that evasion were successful, every merchant who desires to broadcast advertising leaflets in the streets need only append a civic appeal, or a moral platitude to achieve immunity from the law’s command.” (316 US, at p 55.)
The broad statement in Chrestensen that government may freely regulate commercial advertising, without regard to First Amendment considerations, has been disapproved in more recent cases and is no longer controlling. (Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 758-760, supra; Bigelow v Virginia, 421 US 809, 820.) Although the "sweeping proposition that advertising is unprotected per se” has not survived close scrutiny, the Supreme Court has made it clear that the narrow holding in Chrestensen remains unshaken, stating recently that "the ordinance was upheld as a reasonable regulation of the manner in which commercial advertising could be distributed.” (Bigelow v Virginia, supra, at p 819.)
I would not rest on the blind authority of Chrestensen alone, for I would also conclude that the interest of the city in regulating traffic and commerce on its streets and thoroughfares outweighs the interest, in favor of commercial advertisers, in distributing commercial handbills to pedestrians. The city ordinance is primarily designed to guard against the cumulation of litter in the streets. The ordinance also serves to guard against the obstruction of pedestrian and vehicular traffic and the harassment- of passersby. (Cf. Administrative Code of City of New York, § 435-10.1 [prohibiting persons from standing in front of stores and, by using a variety of methods, including distribution of handbills, from enticing passersby to enter such stores].) The municipality has a manifest interest in maintaining order on its streets and insuring the free flow of traffic on its thoroughfares. In our urbanized society, the streets and public ways are the focal points of human social and business activity. Particularly in the central city where vehicular traffic is frequently, if not usually snarled and *541 curtailed, the streets and sidewalks are the convenient, if not the only, means of moving from one point to the next. In short, the streets are where the people are and, thus, where the potential audience is. By merely standing on the sidewalk of a busy, crowded thoroughfare, a speaker gains access to the vast numbers of people whom necessity places within the range of his voice or the reach of his arm. Leafletting is an inexpensive, time-honored means of delivering information and opinion directly, literally, into the hands of the public, whose natural reaction is to immediately accept or reject the tendered leaflet and continue on the way. Common experience teaches that the leaflet is either retained for future study or cast, sometimes after a hurried glance, into the street.
Since the formation of the American Republic, leafletting has been an accepted and protected form of political, social and religious communication. (E.g., Schneider v State, 308 US 147, 162, supra.) Commercial interests now seek to obtain the same privilege. Although commercial speech is protected, to some measure, by the First Amendment, the majority overlooks the simple fact that not every type of protected speech occupies the same position on the scale of values. The considerations that compel protection of political, social and religious pamphleteering simply do not apply when the message sought to be communicated is purely commercial. The stream of commercial speech, directed solely at the solicitation of business, may be more closely regulated than other forms of communication, provided that the free flow of consumer information is not unduly impaired.
In this case, the city has not attempted to prevent the advertising of any particular commercial information. Nor has the city foreclosed advertisers from using other mediums of communication, including other means of addressing the consumer on the street. For example, advertisers may place posters on specially designed kiosks, on billboards, on buses and taxicabs, and on the sides of waste receptacles. The city has only prohibited the form of commercial advertising that contributes, most directly and significantly, to the cumulation of litter in the streets—the throw-away leaflet handed to passing members of the public. I also note that another form of advertising, the free sample, is frequently distributed on the city streets. Since the item distributed is of economic value, there is little danger of clutter in the streets caused by the casual toss-away and the ordinance does not prohibit this *542 practice. Thus, although one channel has been closed, the stream of commercial information flows unabated.
I take cognizance of the crushing financial plights of the central cities in this State. Caught between inflation-spiraled expenditures and a dwindling tax base, the central cities have been hard put to maintain the present level of essential municipal services, not the least of which is sanitation. It is one thing to hold that municipalities, and through them their citizens, must bear the cost of removing from the streets the litter left in the aftermath of political, social and religious expression. This is part of the price imposed by our democratic process. However, it is quite another matter to suggest that the cities must bear the burden of cleansing the streets of leaflets distributed in the name of the profit motive. Recent experience in New York City indicates that litter related sanitation problems are by no means an insignificant health hazard.
Finally, it should be noted that the New York City ordinance applies with equal force to the person, who upon receipt of any kind of leaflet, political or commercial, casually discards it onto the street. It is readily apparent that, in large crowds or on crowded sidewalks, enforcement directed at the litterer can be sporadic and random, at best. Recognizing that any of the myriad of businesses and commercial enterprises located within' the city might attempt to advertise by leaflet, the city has moved to effectively eliminate one of the major potential sources of litter. I believe that this is a reasonable effort, one without substantial prejudice to businesses within New York City, and has been prompted by the demands of real necessity. (See People v Taub, 37 NY2d 530, 532, and cases cited.)
Hence, I conclude that the New York City ordinance prohibiting the distribution of commercial leaflets in the streets is a reasonable and constitutionally permissible manner and place regulation of commercial speech. Accordingly, I dissent and vote to affirm the order of the Appellate Term.
Judges Gabrielli and Cooke concur with Judge Wachtler; Judge Fuchsberg concurs in result in another opinion; Judge Jones dissents in part and votes to modify in a separate opinion; Judge Jasen dissents and votes to affirm in another separate opinion in which Chief Judge Breitel concurs.
Order reversed and the information dismissed.

. The section, in its entirety, provides: "No person shall throw, cast or distribute, or cause or permit to be thrown, cast or distributed, any handbill, circular, card, booklet, placard or other advertising matter whatsoever, in or upon any street or public place, or in a front yard or courtyard, or on any stoop, or in the vestibule of any hall in any building, or in a letter box therein; provided that nothing herein contained shall be deemed to prohibit or otherwise regulate the delivery of any such matter by the United States postal service, or prohibit the distribution of sample copies of newspapers regularly sold by the copy or by annual subscription. This section is not intended to prevent the lawful distribution of anything other than commercial and business advertising matter.” Violations are punishable by a fine of up to $100 and/or imprisonment for a period of up to 30 days. (Subd 8.)

. Defendant has paid the fine.